

FILED

Aug 25 2025, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Amari Erik Lenoir,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

August 25, 2025

Court of Appeals Case No.
24A-CR-2963

Appeal from the St. Joseph Superior Court

The Honorable Elizabeth C. Hurley, Judge

Trial Court Cause No.
71D08-2312-MR-27

---

**Opinion by Judge DeBoer**
Chief Judge Altice and Judge Pyle concur.

**DeBoer, Judge.**

## Case Summary

[1] Amari Erik Lenoir appeals his conviction and sentence following a jury trial on a charge of murder. He contends the trial court committed fundamental error by giving an incomplete jury instruction on the law of self-defense and that his ten-year firearm sentencing enhancement warrants revision under Indiana Appellate Rule 7(B). Finding no error, we affirm.

## Facts and Procedural History

[2] In October 2020, eighteen-year-old Lenoir lived with his father, Erik Lenoir (Erik), on Queen Street in South Bend. Noah Glassburn, Lenoir's close friend, lived across the street. Lenoir spent the evening of Halloween 2020 at Glassburn's house, where Glassburn was "[g]etting real messed up" and "[s]moking a lot of weed." Transcript Vol. 2 at 102. Several others were also present that evening, including Glassburn's father and brother.

[3] At some point late that night, Dorian Harris pulled up outside the Lenoirs' home driving a 2012 Buick LaCrosse owned by Richard Halliburton, who was asleep in the passenger's seat. It is not clear from the record exactly why Harris had driven there. Halliburton recounted that he and Harris were "[j]ust out cruising" with no particular destination in mind. *Id.* at 85. But Harris had previously dated Lenoir's aunt, Tomeka Carter, and according to Erik had followed her to Queen Street that evening.

[4] Shortly after Harris and Halliburton arrived outside the Lenoirs' home, Lenoir announced to those present at Glassburn's house that "some people had followed my aunt[,] so we need to go outside." *Id.* at 105. At this same time, Glassburn observed Lenoir "run into [Glassburn's] room[,]" where Glassburn stored his 9-millimeter handgun. *Id.* at 112. Later, Glassburn would discover that his handgun was missing, apparently having been taken by Lenoir.

[5] When Glassburn went outside, he saw Harris standing in the street and the two got into a verbal altercation. Halliburton, still sleeping in the passenger seat of his car, awoke when he "heard somebody arguing[.]" *Id.* at 85-86. Halliburton got out of vehicle and saw Harris standing in the street across from Glassburn, Lenoir, and Carter. Glassburn demanded that Harris and Halliburton leave, while Lenoir aimed Glassburn's 9mm handgun at Harris.

[6] During this standoff, Erik came out of his house. According to Glassburn, Harris walked up to Erik, used "fighting words[,]" and acted like he was "getting ready to fight[.]" *Id.* at 118. Erik offered a different account, insisting that he was the one who approached Harris "because he was at my house." *Id.* at 186. Although Glassburn believed that Halliburton was holding a gun, Halliburton said that neither he nor Harris was armed, and no weapons were ever found at the scene. Nonetheless, as Erik approached him, Harris "reach[ed] for something." *Id.* at 187. Lenoir then fired multiple shots, one of which struck Harris in the head, killing him.

[7] Lenoir fled Queen Street on foot. The following day, Lenoir contacted Jasmine, the mother of his child, through Facebook messenger. He told her that he was going to Chicago, where he would need to stay for at least a week. Exhibits Vol. 4 at 112-13. Jasmine then sent Lenoir a screenshot of a news article which described that Harris suffered "at least one gunshot wound." *Id.* at 115. Lenoir responded, "lol he got hit 4 time[s.] 1 head rest body[.]" *Id.* at 116.

[8] Days later, Lenoir messaged Jasmine to tell her he was in Chicago, had "to skip town[,]" and was waiting at a Greyhound bus terminal. *Id.* at 117-19. From there, Lenoir traveled to Texas and stayed there for approximately one month before returning to Indiana.

[9] After a three-year investigation, the State charged Lenoir with murder, a felony,[1] and sought a firearm sentencing enhancement.[2] Appellant's Appendix Vol. 2 at 13, 15. At trial, Lenoir argued that he shot Harris in self-defense or in defense of others present with him that night. Both the State and Lenoir tendered proposed jury instructions on self-defense. *Id.* at 38, 61. At the conclusion of evidence, Lenoir argued that the State's proposed instruction did not accurately state the law as applied to the evidence presented at trial:

> [Lenoir's Counsel]: . . . [T]he State's instruction specifically sp[eaks] about defending others through force. Noah Glassburn

---

[1] Ind. Code § 35-42-1-1.

[2] I.C. § 35-50-2-11.

said something to the effect— . . . [h]e felt like deadly force was being directed at himself . . . and everyone else, which would include [Lenoir] because the context of that testimony was that [Lenoir] was present.

So I just included use of force to protect oneself and others because of that testimony from [Glassburn] where he said deadly force was being directed against everyone not specifically against either Tomeka Carter or Eri[k] Lenoir. But other than [that], I eliminated the surplus language in the instances when force is not available. That's the only difference between the one that I've tendered last evening and the State tendered.

Tr. Vol. 2 at 203-204. Lenoir's proposed instruction indicated that it was based on Pattern Jury Instruction No. 10.0300 which counsel had "[e]dited for the [f]acts of this [c]ase[.]" Appellant's App. Vol. 2 at 61. The trial court used Lenoir's proposed language to instruct the jury on self-defense. *Compare id.* (Lenoir's proposed instruction) *with id.* at 71 (the trial court's instruction, using language identical to Lenoir's proposed instruction with minor formatting changes).

[10] The jury found Lenoir guilty of murder. Lenoir waived a jury trial on the firearm sentencing enhancement, and the trial court found Lenoir guilty of using a firearm in the commission of Harris's murder. The court imposed a fifty-year sentence for murder enhanced by ten years for using a firearm, for a total sentence of sixty years. The court ordered this sentence to run consecutive to a twenty-six-year sentence Lenoir was already serving for unrelated

attempted robbery convictions under Cause No. 71D03-2306-F2-12. This appeal ensued.

## Discussion and Decision

## 1. Self-Defense Instruction

Lenoir challenges his murder conviction, arguing that "[t]he self-defense instruction given to the jury misstated the law[.]" Appellant's Br. at 5. Jury instructions are generally reviewed for abuse of discretion. *Miller v. State*, 188 N.E.3d 871, 874 (Ind. 2022). Where "a defendant fails to object to an instruction, he waives appellate review." *Id*. Nonetheless, we may review an instruction for fundamental error even where the defendant failed to object. *Dunn v. State*, 230 N.E.3d 910, 914 (Ind. 2024). "An error is fundamental if it 'made a fair trial impossible' or constituted a 'clearly blatant violation of basic and elementary principles of due process that presented an undeniable and substantial potential for harm.'" *Id.* (quoting *Miller*, 188 N.E.3d at 874).

Indiana's self-defense statute provides, in part, that a person "is justified in using deadly force" if they "reasonably believe[] that the force is necessary to prevent serious bodily injury[3] to the person or a third person or the commission

---

[3] "Serious bodily injury" is "bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus." I.C. § 35-31.5-2-292.

of a forcible felony."[4] I.C. § 35-41-3-2(c). Lenoir concedes that he did not object to the trial court's self-defense instruction—and that he proposed the language given by the court in its instruction—but he argues that the court committed fundamental error by giving the jury an incomplete statement of the law of self-defense.

[13] The trial court's self-defense instruction did not include language regarding the commission of a forcible felony and instead provided: "A person is justified in using deadly force, and does not have a duty to retreat, *only if* he reasonably believes that deadly force is necessary to prevent *serious bodily injury* to himself or a third person." Appellant's App. Vol. 2 at 71 (emphasis added). We note, however, that Lenoir's counsel proposed this instruction and informed the trial court that he had edited the pattern jury instruction "for the [f]acts of this [c]ase[.]" *Id*. at 61. As such, Lenoir invited any error that arose from the self-defense instruction and is precluded from obtaining relief from that error on direct appeal. *See Miller*, 188 N.E.3d at 874-75 ("The invited-error doctrine generally precludes a party from obtaining appellate relief for his own errors, even if those errors were fundamental.").

[14] A party invites an error if it "resulted from [their] affirmative actions as part of a deliberate, 'well-informed' trial strategy." *Batchelor v. State*, 119 N.E.3d 550, 558 (Ind. 2019) (quoting *Brewington v. State*, 7 N.E.3d 946, 954 (Ind. 2014), *reh'g*

---

[4] A "forcible felony" is "a felony that involves the use or threat of force against a human being, or in which there is imminent danger of bodily injury to a human being." I.C. § 35-31.5-2-138.

*denied, cert. denied*).  Though mere neglect or failure to object to an instruction generally does not constitute an invitation to err, we will find invited error if there is "evidence of counsel's strategic maneuvering at trial[.]"  *Miller*, 188 N.E.3d at 875 (quoting, *Batchelor*, 119 N.E.3d at 557).

[15]     In *Miller*, the State charged the defendant, Terrance Miller, with multiple offenses, including unlawful possession of a firearm by a serious violent felon. *Id.* at 873.  Even though the trial court partially bifurcated the unlawful possession of a firearm charge from the remaining charges,[5] Miller's counsel agreed to a preliminary instruction informing the jury that "[a] person who knowingly or intentionally possesses a firearm **after having been convicted of and sentenced for an offense under I.C. 35-47-4-5** commits possession of a firearm in violation of I.C. 35-47-4-5, a level 4 felony."  *Id.* at 873-74 (emphasis in original).  On appeal, our Supreme Court rejected Miller's argument that the trial court committed reversible error by informing the jury of his prior felony conviction, reasoning:

> Assuming [the] Preliminary Instruction [] was fundamental error, Miller invited it.  The instruction was part of his counsel's explicit "strategic decision" to partially bifurcate the unlawful possession charge, which was certainly permissible[.] [S]ee *Russell v. State*, 997 N.E.2d 351, 353–55 (Ind. 2013) (upholding partial bifurcation).  Miller's counsel not only affirmed the instruction "look[ed] correct," he also stated that "we are including the

---

[5] "One of the purposes of bifurcation is to keep prior convictions away from the jury in its initial determination of guilt for the substantive crime charged."  *Brook v. State*, 221 N.E.3d 1239, 1248 (Ind. Ct. App. 2023), *trans. denied*.

statute but not referring to the actual offence [sic], which would be prejudicial." He was very much aware of the potential for prejudice if the jury knew Miller's criminal history. Indeed, he had even filed a motion in limine—which was discussed and granted right after the instruction was discussed and approved—to exclude references during the trial's first phase to Miller's previous convictions and incarcerations and the pending habitual offender enhancement. Yet he still requested the instruction as part of his strategy. He "did far more than simply fail to object." *Durden v. State*, 99 N.E.3d 645, 656 (Ind. 2018).

*Id.* at 875 (internal record citations omitted).

[16]     As in *Miller*, the record before us demonstrates that Lenoir's counsel purposefully omitted reference to a "forcible felony" from his proposed self-defense instruction as part of a deliberate trial strategy. Lenoir's proposed instruction indicates that his counsel edited Pattern Instruction No. 10.0300 "for the [f]acts of the [c]ase[.]" Appellant's App. Vol. 2 at 61. Moreover, Lenoir's counsel explained that Lenoir's proposed instruction was tailored to the evidence presented at trial—specifically Glassburn's testimony that "[h]e felt like *deadly force* was being directed at himself . . . and everyone else[.]" Tr. Vol. 2 at 204 (emphasis added).

[17]     The threat of deadly force was also a major theme of Lenoir's closing argument, where his counsel argued:

> Now, [Glassburn] told you that it was turning physical. And he said the man who was shot, the late Mr. Harris, was being loud and obnoxious. [A] witness called by the State [] said the two men at the car said words like ["]I've got mine and you've got

yours.["]  What other meaning could there be to that?  The State words [sic] alone are not enough to justify deadly force.  But when you have [a witness] saying everyone had guns.  You had Noah Glassburn saying Richard Halliburton was reaching.  You have Erik Lenoir saying Dorian Harris reaching [sic].  And you have  [a witness] saying he heard these words ["]I've got mine and you've got yours.["]

That's not words.  That's words coupled with action.  Armed or not, *the actions are the actions of people who want people to believe that they're capable of employing deadly force. . . .*

Think of the evidence that tends to suggest this was force meeting force.  And think of what [Glassburn] said and what [the State's witness] said.  And you have to come to the conclusion that this tragedy, this loss of life, and I think I speak for everyone in this room in saying we wish had not happened.  That we wish Dorian Harris could live to grow old was nonetheless one that was *justified under the concept of deadly force repelling other deadly force.*

Tr. Vol. 2 at 239-240 (emphasis added).  From this, we are persuaded that Lenoir's counsel deliberately declined to argue that Lenoir used deadly force to prevent the commission of a forcible felony and instead elected to present the theory that Lenoir used deadly force to fend off serious bodily injury.  *See* I.C. § 35-31.5-2-292 (defining "[s]erious bodily injury" in part as "bodily injury that creates a substantial risk of death").

[18]  We do not agree with Lenoir's argument that "[i]f anyone 'invited' the fundamental error in the self-defense instruction at trial, . . . it was the State of Indiana."  Appellant's Reply Br. at 4.  According to Lenoir, his counsel merely copied the State's proposed jury instruction—which also omitted reference to a

"forcibly felony"—and "assum[ed] that the State's proposed self-defense instruction had followed the pattern instruction and the self-defense statute." *Id.* at 5. But this contradicts Lenoir's argument to the trial court that the State's instruction was incomplete because it "specifically spoke about defending *others* through force" but failed to address the "use of force to protect *oneself*[.]" Tr. Vol. 2 at 203-04 (emphasis added). Clearly, Lenoir's counsel was aware that the State's instruction did not perfectly mirror the self-defense statute. This convinces us that Lenoir's counsel did not commit an oversight, as Lenoir claims, when he omitted the statutory forcible felony language from his proposed instruction—it was deliberate.

[19] Because the record before us contains evidence that the self-defense instruction given to the jury was the product of Lenoir's deliberate trial strategy, Lenoir invited any corresponding error and cannot seek relief from that error on direct appeal. *See Durden*, 99 N.E.3d at 656 (finding invited error where counsel decided to engage in a rational but unsuccessful trial strategy).

## 2. Firearm Sentencing Enhancement

[20] Lenoir next asks that we revise his firearm sentencing enhancement pursuant to our authority under Indiana Appellate Rule 7(B). Specifically, Lenoir requests that we "suspend his additional ten-year [f]irearm [s]entencing [e]nhancement to probation." Appellant's Br. at 11.

[21] Under Appellate Rule 7(B), we "'may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is

inappropriate in light of the nature of the offense and the character of the offender.'" *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020) (quoting Ind. Appellate Rule 7(B)). "When we review a sentence under Appellate Rule 7(B), we show the trial court 'considerable deference.'" *Oberhansley v. State*, 208 N.E.3d 1261, 1267 (Ind. 2023) (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008)). As such, "a trial court's sentencing decision will generally prevail 'unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character).'" *Konkle v. State*, 253 N.E.3d 1068, 1093 (Ind. 2025) (quoting *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015)). The burden is on the defendant to persuade us that his sentence is inappropriate. *Id.* at 1092-93.

[22] As to the nature of Lenoir's offense, our review begins with the advisory sentence as "the starting point the Legislature has selected as an appropriate sentence for the crime committed.". *Anglemeyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). Indiana Code section 35-50-2-11 provides that after a conviction for certain offenses, including murder, a court may sentence a person to an additional fixed term of imprisonment between five and twenty years if the State can show beyond a reasonable doubt that the person knowingly or intentionally used a firearm in the commission of the offense. Ind. Code § 35-50-2-11(b)(1), (d), (g).

[23] Here, Lenoir received a ten-year firearm sentencing enhancement following his conviction for Harris's murder. Indiana Code section 35-50-2-11 contains no language about an advisory sentence for the firearm sentencing enhancement after a murder conviction. We note, however, that while the advisory sentence for Lenoir's murder conviction was fifty-five years, the trial court imposed a more lenient fifty-year sentence. *See* I.C. § 35-50-2-3(a) (providing fifty-five-year advisory sentence for murder). With a ten-year firearm enhancement, Lenoir's resulting sixty-year sentence is effectively the same as it would have been had the trial court imposed the fifty-five-year advisory sentence for murder with the statutory-minimum five-year firearm enhancement. *See Burkhart v. State*, 259 N.E.3d 347, 354 (Ind. Ct. App. 2025) (citing I.C. § 35-50-2-11(g) and noting the minimum sentence for the firearm enhancement is five years), *trans. denied*.

[24] Accordingly, we must "consider, among other things, 'whether there is anything more or less egregious about the offense committed by the defendant that makes it different from the "typical" offense accounted for by the legislature when it set the advisory sentence[.]'" *Id.* (quoting *T.A.D.W. v. State*, 51 N.E.3d 1205, 1211 (Ind. Ct. App. 2016)). We also consider whether Lenoir's offense was "accompanied by restraint, regard, and lack of brutality[.]" *Stephenson*, 29 N.E.3d 122.

[25] There is no question that Lenoir demonstrated a lack of restraint or regard when he murdered Harris. Though Lenoir claims that he shot Harris to protect himself and others present on Queen Street, he fired as many as eleven shots at close range, with one witness describing that "he was throwing shots"

indiscriminately into the street.  Tr. Vol. 2 at 137.  Lenoir shot Harris several times in the body and once in the head, and the locations of the shell casings found at the scene suggest that after firing an initial barrage of eight shots, Lenoir moved closer to Harris and shot the gun three more times.  Moreover, Lenoir did not attempt to render or procure aid for Harris and instead ran from the scene, eventually fleeing to Chicago and then Texas.

[26]  In considering Lenoir's character, "we engage in a broad consideration of [Lenoir's] qualities[.]" *Burkhart*, 259 N.E.3d at 355 (quoting *T.A.D.W.*, 51 N.E.3d at 1211).  This includes "whether the defendant has 'substantial virtuous traits or persistent examples of good character[.]'" *Id.* (quoting *Stephenson*, 29 N.E.3d at 122).  Lenoir contends that his sentence on the firearm enhancement is excessive because he was eighteen years old at the time he murdered Harris "and had no history of delinquency or criminal activity." Appellant's Br. at 12.  However, as our Supreme Court has explained, "focusing on chronological age, while often a shorthand for measuring culpability, is frequently not the end of the inquiry for people in their teens" as there are "relatively young [offenders] who appear hardened and purposeful." *Monegan v. State*, 756 N.E.2d 499, 504 (Ind. 2001).

[27]  Despite Lenoir's young age, he demonstrated an utter lack of remorse for killing Harris, not only by fleeing the state instead of facing the consequences of his actions but also by writing "*lol* he got hit 4 time[s]" in reference to Harris's murder.  Ex. Vol. 4 at 116 (emphasis added).  And while Lenoir had no prior history of criminal charges predating the murder, his Pre-Sentencing

Investigation Report indicated that he had engaged in illegal drug activity throughout his teenage years, a factor that offset Lenoir's lack of criminal history. *See Conley v. State*, 972 N.E.2d 864, 874 (Ind. 2012) (explaining defendant's lack of criminal history may be offset by actual criminal behavior), *reh'g denied*.

[28] Additionally, the fact that Lenoir committed additional violent criminal acts after he murdered Harris reflects poorly on his character. As Lenoir acknowledges, "*after* he committed and *before* he was charged with" Harris's murder, "he committed and was convicted of two attempted robberies[.]" Appellant's Br. at 12 (emphasis in original). We agree with the State that Lenoir's commission of two subsequent violent felonies "indicates that the current offense was not an isolated event but instead was indicative of a propensity to engage in volent, criminal conduct." Appellee's Br. at 16.

[29] The trial court ran Lenoir's sentence in this case consecutive to his twenty-six-year sentence for his attempted robbery convictions. Lenoir concedes that the trial court "understandably and appropriately chose to run the sentence in this case consecutively to" his prior convictions. Appellant's Br. at 12. He contends, however, that the court's "decision to run the sentences consecutively adequately took into account" Lenoir's demonstrated propensity for violence. *Id.* But we note that Lenoir's prior convictions were not the only aggravating factors considered by the trial court in imposing a ten-year firearm sentencing enhancement. The court also considered the need for Lenoir's sentence to match the seriousness of his crime, reasoning that

there needs to be some reflection of the seriousness of utilizing a gun in the manner in which [Lenoir] did and causing the damage [Lenoir] did as a result of that. And so I'm enhancing the sentence by an additional 10 years for a total of 60-year sentence on the murder charge.

Tr. Vol. 3 at 34.

[30] Based on the serious nature of Lenoir's offense, his apparent lack of remorse for having committed it, and his continued violent criminal behavior, we cannot say that Lenoir has presented us with compelling evidence demonstrating that the nature of his offense or his character render his ten-year firearm sentencing enhancement inappropriate, particularly considering the fact that the court imposed less than the advisory sentence for the underlying murder conviction.

## Conclusion

[31] In light of the foregoing, we conclude that Lenoir invited any error in the self-defense jury instruction, and we further decline to revise Lenoir's ten-year firearm sentencing enhancement.

[32] Affirmed.

Altice, C.J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

John Kindley
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana


George P. Sherman
Supervising Deputy Attorney General
Indianapolis, Indiana